## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARTHA JEAN MAY,                 :
                                 :
            Plaintiff,           :        No. 3:20-cv-00577
                                 :
      v.                         :        (Saporito, M.J.)
                                 :
KILOLO KIJAKAZI[1], Acting       :
Commissioner of Social           :
Security,                        :
                                 :
            Defendant.           :

## MEMORANDUM

This is an action brought under 42 U.S.C. §405(g), seeking judicial

review of the Commissioner of Social Security's ("Commissioner") final

decision denying Martha Jean May's ("May") claim for supplemental

security income under Title XVI of the Social Security Act.  This matter

has been referred to the undersigned United States Magistrate Judge on

consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c)

---

[1] Kilolo Kizakazi became the Acting Commissioner of Social Security on July 9, 2021.  She has been automatically substituted in place of the original defendant, Andrew Saul. See Fed. R. Civ. P. 25(d); see also U.S.C. 405(g) (action survives regardless of change in the person occupying the office of Commissioner of Social Security).  The caption in this case is amended to reflect this change

and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 9; Doc. 10; Doc. 12).

For the reasons stated herein, we will vacate the Commissioner's decision and remand the case for further consideration.

## I.   *Background and Procedural History*

May is an adult individual born June 5, 1965, who was 51 years old at the time of her amended alleged onset date of disability and date of application—May 8, 2017. (Tr. 71-72). May's age at the onset date and date of application makes her an "individual approaching advanced age" under the Social Security Act. *See* 20 C.F.R. § 416.953. It is unclear from the record whether May graduated from sixth, seventh or eighth grade, as there are conflicting reports and testimony. (Tr. 33, 505). Prior to her alleged onset date, May worked as a cleaner/maid. (Tr. 202).

On May 8, 2017, May protectively filed for supplemental security income pursuant to Title XVI of the Social Security Act. (Tr. 13). In her application, May alleged that she became disabled beginning February 17, 2017, as a result of posttraumatic stress disorder, mood swings, general anxiety, attention deficit disorder, social anxiety, and acid reflex. (Tr. 13, 173).  May later amended her onset date to May 8, 2017, to

coincide with her date of application.  (Tr. 13)  May's claim was initially denied on October 10, 2017. (Tr. 93-97). Thereafter, May filed a timely request for an administrative hearing on December 18, 2017, and it was granted. (Tr. 98-100, 101-115). May, represented by counsel, appeared and testified before ALJ, Richard E. Guida ("ALJ"), on December 12, 2018, in Harrisburg, Pennsylvania. (Tr. 13, 28). In addition, an impartial vocational expert, Richard Anderson, appeared and testified during the administrative hearing. (Tr. 30). At the time of this hearing, May was 54 years old and resided in Gettysburg, Pennsylvania, which is in the Middle District of Pennsylvania. (Tr. 32, 71). By a decision dated February 20, 2019, the ALJ denied May's application for benefits. (Tr. 10-27).   May sought further review of her claim by the Appeals Council of the Office of Disability Adjudication and Review, but her request was denied for review on February 3, 2020. (Tr. 835). May subsequently filed an appeal to this court on April 6, 2020, arguing that the ALJ's decision was not supported by substantial evidence. (Doc. 1). On September 15, 2020, the Commissioner filed his answer, in which he maintains that the ALJ's decision is correct and in accordance with the law and regulations. (Doc. 13, at 3). This matter has been fully briefed by the parties and is

ripe for decision. (Doc. 15; Doc. 16; Doc. 17; Doc. 19, Doc. 20).

May's treatment records showed that, in the year preceding her application for SSI benefits, she was visiting Wellspan Behavioral Health for treatment of anxiety and depression. (Tr. 288-320). Her prescribed treatment regimen was therapy and medication. (Tr. 288, 298). May reported worsening anxiety and depression in February 2017, three months before her application, and after her prior application for benefits was denied. (Tr. 59-70, 293).

The month after she applied, in June 2017, May had not been taking her prescribed medication due to cost, and she was irritable and angry with her husband for not helping her financially. (Tr. 289). However, despite her abnormal mood and "loud" speech, her mental status was normal—her thought process was goal directed, her thought content was intact, her cognition was within normal limits, and her insight and judgment were appropriate. (Tr. 289).

May spoke with an interviewer over the telephone in an SSA field office as part of her disability claim in July 2017. (Tr. 182-84). The interviewer did not observe any difficulty in May's ability to understand, concentrate, talk, or answer questions. (Tr. 183).

At a medication monitoring visit with her mental health provider, Johar Shah, M.D., in August 2017, May reported stressors, noting issues with her husband, a previous denial of a social security disability claim, and worries about her physical health. (Tr. 498). Dr. Shah noted May's depression and anxious mood, and that she appeared poorly groomed and distracted; however, her speech was normal; her thought  process was goal directed; her insight and judgment were appropriate; her memory was appropriate; and her language and knowledge were not abnormal. (Tr. 498). Dr. Shah recommended an adjustment to her medication regimen, based on May's reports that hydroxyzine was not helping, and added gabapentin instead. (Tr. 498).

May visited Christopher Gipe, MS a month later for a consultative examination as part of her disability claim. (Tr. 505-12). Mr. Gipe noted that although her file indicated that May had an eighth-grade education "her test results suggests very poor educational background and intellectual level."  (Tr. 505).   May alleged significant symptoms, including difficulty interacting with others, difficulty concentrating, panic attacks, sleep disturbance, and issues with concentration and short-term memory. (Tr. 506-07). Mr. Gipe observed that May was

cooperative and related adequately during the examination. (Tr. 507).
May's speech was fluent and clear with adequate expressive and
receptive language; her thought processes were coherent and goal
directed. (Tr. 507). Her affect was anxious, depressed, and hopeless, and
she reported that her mood was nervous. (Tr. 507). In terms of attention
and concentration and memory skills, Mr. Gipe noted that May was
"[i]mpaired due to anxiety and limited intellectual functioning," noting
that May counted, but could not do simple calculations or begin serial 7s;
she remembered three objects immediately, but not after a delay; and she
remembered four digits forward, but not backward. (Tr. 508). Mr. Gipe
listed unspecified bipolar and related disorder, depressive disorder, panic
disorder, agoraphobia, anxiety disorder, and post-traumatic stress
disorder under diagnoses, recommended that May continue her
treatment, and gave a fair to guarded prognosis. (Tr. 509). Mr. Gipe said
that May could not manage her own finances due to limited intellectual
functioning.   (Tr. 509). In the completed check-box form, Mr. Gipe
checked that May had a "moderate" impairment ("fair" ability to function
on a sustained basis) for understanding, remembering, and carrying out
simple instructions, and making judgments on simple work-related

decisions. (Tr. 510-11). Mr. Gipe checked that May had a "marked" impairment ("seriously limited" in the ability to function on a sustained basis) for complex instructions and tasks. (Tr. 510). For social functioning and changes in a work-setting, Mr. Gipe also checked "marked." Mr. Gipe's explanation was "severity of psychiatric symptoms." (Tr. 511).

Dr. Gold considered all of the above evidence, and made administrative medical findings regarding May's level of limitation and mental RFC. Dr. Gold found Mr. Gipe's opinion not persuasive because it was not supported and not consistent with the medical evidence of record. (Tr. 77, 79). As support, Dr. Gold cited the field office interviewer's observations, May's treatment records from Wellspan, and her statements about her daily activities. (Tr. 77, 84, 501). Dr. Gold found that this evidence supported no more than moderate limitations in broad areas of functioning. (Tr. 77). For May's ability to "perform sustained work activities," Dr. Gold found that May was able to understand simple instructions, ask simple questions and complete simple tasks, and relate superficially. (Tr. 82-83). Dr. Gold found that May was "able to engage in simple, routine tasks with limited contact with the public." (Tr. 84).

On July 17, 2018, May was seen by her therapist, Deborah Asper,

LCSW, who noted that she needed to assist May in completing disability forms for her attorney and stated, "she reminds me that she is illiterate." (Tr. 600).

At the hearing, the ALJ raised the issue, noting that one of the medical records made reference to the fact that May was illiterate. (Tr. 34). May testified that she had completed sixth grade and attended, but did not complete, seventh grade. (Tr. 33-34).

The colloquy between May and the ALJ with regard to her ability to read was as follows:

> ALJ:  All right.  Can you read and write?
>
> May:  Not very good at all.
>
> ALJ: What does that mean?
>
> May: No.  Like small words like the, you know what I mean, but as far as reading I don't understand it.  I don't know any big words.
>
> ALJ: I ask in part because one of the medical records said that you were illiterate, can't read. All right.
>
> May:  But I can't read.  Like, you know, like the only thing I know is like dog, cat, like small with three words.
>
> ALJ:  Okay, when is the last you worked?

(Tr. 34).

Thus, the ALJ moved on to other issues and did not follow up on the issue of illiteracy.

May testified that her medications made her sleepy. (Tr. 37). May testified that two days a week she does not want to get out of bed. (Tr. 38). She testified that she has panic attacks which cause her to become dizzy and lightheaded, to sweat and to tremble. (Tr. 39-40). The ALJ asked May about a medical record which stated that she had a panic attack when her grandchildren visited her. (Tr. 40).

In terms of daily activities, May stated that she forces herself to do anything. (Tr. 45-46). She testified that she "don't play no games" on her cellphone but "do got Facebook." (Tr. 46). She stated that she goes on Facebook "Not long. I like seeing what's on there. I like to look at the pictures." (*Id.*) She testified that she does not eat and that she does not go to the grocery store. (Tr. 47).

## II. *Legal Standards*

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g)

(sentence five); *Id.* § 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether the claimant is

disabled, but whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive disability benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a); *Id.* § 416.905(a). To satisfy this requirement, a claimant must have a severe

physical or mental impairment[2] that makes it impossible to do his or her
previous work or any other substantial gainful activity[3] that exists in the
national economy. 42 U.S.C. § 423(d)(2)(A); *Id.* § 1382c(a)(3)(B); 20 C.F.R.
§ 404.1505(a); *Id.* § 416.905(a).

The Commissioner follows a five-step sequential evaluation process
in determining whether a claimant is disabled under the Social Security
Act. 20 C.F.R. § 404.1520(a); *Id.* § 416.920(a). Under this process, the
Commissioner must determine, in sequence: (1) whether the claimant is
engaged in substantial gainful activity; (2) whether the claimant has a
severe impairment; (3) whether the claimant's impairment meets or
equals a listed impairment;[4] (4) whether the claimant is able to do past
relevant work, considering his or her residual functional capacity
("RFC");[5] and (5) whether the claimant is able to do any other work,

---

[2] A "physical or mental impairment" is an impairment resulting from
"anatomical, physiological, or psychological abnormalities which are
demonstrable by medically acceptable clinical and laboratory diagnostic
techniques." 42 U.S.C. § 423(d)(3); *Id.* § 1382c(a)(3)(D).
[3] "Substantial gainful activity" is work that (1) involves performing
significant or productive physical or mental duties, and (2) is done (or
intended) for pay or profit. 20 C.F.R. § 404.1510; *id.* § 416.910.
[4] An extensive list of impairments that warrant a finding of disability
based solely on medical criteria, without considering vocational criteria,
is set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.
[5] "Residual functional capacity" is the most a claimant can do in a work

considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(a); *Id.* § 416.920(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 42 U.S.C. § 423(d)(5); *Id.* § 1382c(a)(3)(H)(i); 20 C.F.R. § 404.1512; *Id.* § 416.912; *Mason*, 994 F.2d at 1064. Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); *Id.* § 416.912(f); *Mason*, 994 F.2d at 1064.

## III.  Discussion

In his February 2019 decision denying May's claim for benefits, the ALJ evaluated May's application for benefits at each step of the sequential process. At step one, the ALJ concluded that May had not

---

setting despite the physical and mental limitations of his or her impairment(s) and any related symptoms (e.g., pain). 20 C.F.R. § 404.1545(a)(1); *id.* § 416.945(a)(1). In assessing a claimant's RFC, the Commissioner considers all medically determinable impairments, including those that are not severe. *Id.* § 404.1545(a)(2); *id.* § 416.945(a)(2).

engaged in substantial gainful activity since May 8, 2017, her protective date of filing. (Tr. 15).

At step two, the ALJ found that the following impairments were medically determinable and severe during the relevant period: asthma; chronic obstructive pulmonary disease (COPD); obstructive sleep apnea (OSA); obesity; mood disorder; major depressive disorder; generalized anxiety disorder; panic disorder; agoraphobia; and post-traumatic stress disorder. (*Id.*) Additionally, the ALJ found that May had the non-severe impairments of acid reflux and abdominal pain. (*Id.*).

At step three, the ALJ found that May did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, during the relevant period. (Tr. 16-17). Between steps three and four, the ALJ fashioned an RFC considering May's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that [May] has the [RFC] to perform light work as defined in 20 C.F.R. 416.967(b) except she can only occasionally perform postural activities and she must avoid concentrated exposure workplace hazards, extreme temperatures, and pulmonary irritants including fumes, odors, dusts, gases and poorly

> ventilated areas, and workplace hazards. Additionally, [May] can carry out simple, routine tasks and can perform simple work-related decisions with few, if any, workplace changes. Furthermore, she can occasionally interact with supervisors and coworkers and she cannot interact with the public in the performance of her job duties.

(Tr. 17).

At step four, the ALJ found that May had no past relevant work, as her earnings have never reached SGA level. (Tr. 21) Between steps four and five, the ALJ found that May had a limited education and is able to communicate in English. (*Id.*) At step five, the ALJ determined that based on May's age, education, work experience, and RFC that there were a significant number of jobs in the national economy that May could perform, including cleaner/housekeeper, bakery worker, and bottling line attendant. (Tr. 22). Thus, the ALJ found that May did not meet the definition of disabled as set forth by the Social Security Act. (Tr. 23).

May contends that the decision of the ALJ is not supported by substantial evidence of record and she raises two issues on appeal attacking the ALJ findings that the opinions of the treating psychiatrist and consultative examiner were less than very persuasive; and that the ALJ's finding that May can perform light work is not supported by the

record.   (Doc. 15, at 3).   The Court raised the issue of illiteracy, as evidenced in the record and requested that the parties file supplemental briefs on the issue.  (Doc. 18; Doc. 19; Doc. 20).

We find, after a review of the record as a whole, that the ALJ erred in failing to address evidence which indicated that May is functionally illiterate.

### A. The ALJ Failed to Adequately Explain His Finding that May Has a Limited Education and Can Communicate in English

May argues in her brief that education is considered as a vocational factor pursuant to 20 C.F.R. 416.964 and that the regulation notes that "the numerical grade level which a person completed in school may not represent their actual abilities."  (Doc. 20, at 3).  May argues that there is sufficient indication that she is not able to read and write a simple message in any language and therefore should be found illiterate and thus disabled pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.09.  (*Id*. at 5).

The Commissioner stated that the record indicates that May is capable of reading and writing a simple message, as she testified that her problem was in reading and writing "big words," that she was able to

write simple messages on disability forms  located at 202-04 in the transcript and that she had admitted that she could read and write more than her name in English.  (Doc. 19, at 2).   The Commissioner further stated that the ALJ's failure to completely explain his reasoning is reasonable under the circumstances.  (*Id*. at 4).

In reply, May argues that the form located at Tr. 202-04 which the Commissioner relied upon was unsigned and might not have been completed by May. (Doc. 21 at 1-2). The Commissioner, in his reply brief, argues that 20 C.F.R. § 416.964 was not in effect on the date that the case was filed and therefore does not control. (Doc. 22 at 1-2).  Additionally, he argues that May testified she could understand small words and that when asked if she could read or write more than her name, May said "yes" on a form.  (Doc. 22 at 2-3).

We find that May prevails.  First, we are not persuaded by the Commissioner's  argument that the record indicates that May is literate. Secondly, while the Commissioner argues that the ALJ was reasonable in addressing the issue summarily, we disagree.

The ALJ's claim that May's ability to write simple sentences on forms submitted at pages 202-204 of the transcript is an indication that

she is literate are flawed.  The relationship between those forms and May's medical record evidences that the forms were not completed by May.

The forms in question were submitted on July 23, 2018.  (Tr. 202-204).  The forms which the Commissioner refers as proof of May's literacy were submitted five days after May's appointment on July 18, 2018, with her psychologist.   At the appointment on July 18, 2018, May's psychologist, Deborah Asper, LCSW, indicated that she assisted May in completing disability forms because May could not complete them herself that she "reminds me that she is illiterate."  (Tr. 600).  The reasonable conclusion to be drawn from those circumstances is that the forms in question are the forms which Ms. Asper indicated she either completed for May or helped May complete.

Additionally, we are not persuaded by the Commissioner's argument that May stated she could read and write "small words."  (Doc. 22 at 2-3). When May testified that she could only understand "small words"  she was specific that by "small words" she meant three letter words such as "dog" and "cat."  (Tr. 34).

Lastly, the fact that May indicated that she could read and write

more than her name in English is not contradictory to her statement that she could only understand three letter words.  Thus, May's statement that she could read and write more than her name could be both truthful and indicative that she is illiterate.

We next address the Commissioner's argument that the ALJ was not obligated to explain his decision with "ideal clarity" and that the ALJ's "cursory" finding with regard to May's educational background was appropriate.  (Doc. 19, at 4).

The issue of illiteracy is pivotal in this case, as an application of the Medical-Vocational Guidelines at 20 C.F.R., Part 404, Subpart P, Appendix II, Rule 202.09 would direct a finding that May was disabled if she was found to be illiterate.

The Commissioner argues that the ALJ's finding was supported by substantial evidence.  (Doc. 19, at 8).  In particular, the Commissioner argues that the findings of Mr. Gipe did not state specifically that May was illiterate and that Mr. Gipe made a benign finding that "intellectual functioning appeared to be in the below average range with general fund of information somewhat limited."  (Doc. 19, at 6, quoting Tr. 508)  The Commissioner argues that Mr. Gipe did not suggest borderline

intellectual functioning.  (*Id.*)

We disagree.  While Mr. Gipe found that May's intellect was "below average" that does not mean that he found her not to have borderline intellectual functioning.  Indeed, Mr. Gipe stated that May's intellect and education were "very poor."  (Tr. 505).  Additionally, he opined that May would not be able to handle her own finances due to "limited intellectual functioning." (Tr. 508). More importantly, the ALJ did not consider Mr. Gipe's findings in the context of the record as a whole which showed that May's treating psychologist, Deborah Asper, LCSW, considered her to be illiterate and that May herself indicated that she cannot read or write any word more than three letters.  The ALJ ignored not only Mr. Gipe's findings regarding limited intelligence, but also the statement of the treating source, Deborah Asper, and the testimony of May herself.

A determination is not supported by substantial evidence when an ALJ ignores probative and relevant evidence to arrive at it.  To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare,* 714 F.2d 287, 290 (3d Cir.1983). The administrative law judge must consider

all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Wier on Behalf of Wier v. Heckler,* 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981).  *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144 (W.D. Pa. 2011).

An ALJ cannot rely only on the evidence that supports his or her conclusion, but the ALJ also must explicitly weigh all relevant, probative, and available evidence, and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *See Gleason v. Colvin*, 152 F. Supp.3d 364, 386 (M.D. Pa. 2015); *see also Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

In essence, the Commissioner asserts that the ALJ was correct in failing to address the testimony or evidence regarding illiteracy and to make a finding summarily.  (Doc. 19, at 4).  He argues that the ALJ complied with the governing law and regulations. (*Id*. at 8).

We are not persuaded by the Commissioner's argument as to this issue. "Although we do not expect the ALJ to make reference to every relevant treatment note . . . we do expect the ALJ, as the factfinder, to

consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law." *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *see also Gleason*, 152 F. Supp.3d at 386. The ALJ may accept some aspects of the medical evidence and reject other aspects, but must consider all the evidence and give some reason for discounting the rejected evidence. *See Adorno*, 40 F.3d at 48; *see also Fargnoli*, 247 F.3d at 42; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999); *Gleason*, 152 F. Supp.3d at 386.

As mentioned above, the ALJ cannot rely only on the evidence that supports his or her conclusion, but must weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Adorno*, 40 F.3d at 48; *Cotter*, 642 F.2d at 705. In the instant case, the ALJ ignored relevant and probative evidence.

The decision made no mention of the fact that Deborah Asper, LCSW indicated that May is illiterate. Likewise, the ALJ made no mention of the fact that May testified to the fact that she cannot read words larger than three letters. Most significantly, the ALJ addressed the findings of Mr. Gipe in some detail but omitted any reference to the

fact that May suffered from "very poor" education and  intellectual functioning, that May could not manage her own funds due to "poor intellectual functioning," or that May was unable to complete even basic math.  (Tr. 19).

The Court of Appeals has long been concerned with ALJ opinions which fail to properly consider, discuss, and weigh relevant medical evidence. *See Fargnoli*, 247 F.3d at 42; *see also Dobrowolsky v. Califano*, 606 F.2d 403, 406-07 (3d Cir. 1979). It is well-established that "where there is conflicting probative evidence in the record, there is an acute need for the ALJ to provide an explanation of the reasoning behind his or her conclusions, and the Court will vacate or remand a case where such an explanation is not provided. *Fargnoli*, 247 F.3d at 42; *Cotter*, 642 F.2d at 706.

In the present case, the ALJ failed to address pertinent evidence. This leaves the Court with no means to discern whether the ALJ properly considered such evidence of illiteracy.  Because the ALJ disregarded this evidence, the Court finds that the ALJ's finding that May has a limited education and is able to communicate in English is not supported by substantial evidence.

Accordingly, for the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence. Thus, the decision of the Commissioner of Social Security will be vacated and this case will be remanded for further proceedings consistent with this Memorandum.

An appropriate Order follows.

Dated: August 31, 2021                              ***s/Joseph F. Saporito, Jr.***
                                                    JOSEPH F. SAPORITO, JR.
                                                    United States Magistrate Judge